CLERK'S OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED

March 03, 2025

LAURA A. AUSTIN, CLERK
BY: s/B. McAbee
     DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

| | |
|---|---|
| LEVAR FOWLER, ) | |
| ) | |
| Plaintiff, ) | Case No. 4:24-cv-00029 |
| ) | |
| v. ) | **MEMORANDUM OPINION** |
| ) | |
| CAESARS VIRGINIA, LLC, ) | By:  Hon. Thomas T. Cullen |
| ) | United States District Judge |
| Defendant. ) | |

After he complained that a co-worker repeatedly referred to him as "boy," called him the "N-word," and engaged in other allegedly discriminatory and threatening conduct, Plaintiff Levar Fowler ("Fowler") claims that his employer, Caesars Virginia LLC ("Caesars") fired *him* in violation of his federal and state rights. Fowler brought suit in this court alleging claims of discrimination and retaliation under both federal and state law. Caesars moved to dismiss his complaint in part, arguing that his state-law retaliation claim is barred by the applicable statute of limitations and that his hostile-work-environment claim is both unexhausted and insufficiently alleged. Although the court (and apparently Fowler) agree that Fowler's retaliation claim under the Virginia Whistleblower Protection Law is barred by the statute of limitations, Fowler's hostile-work-environment claim was both exhausted before the EEOC and is sufficiently alleged in his pleadings. Accordingly, the court will grant Caesars's motion in part and dismiss Count 6 of Fowler's complaint only.

## I.  STATEMENT OF FACTS AND PROCEDURAL BACKGROUND

On May 1, 2023, Fowler—who is African American—began working at Caesars's new temporary casino facility in Danville, Virginia, as a Table Games Dual Rate Assistant Shift

Manager and Supervisor ("DRASM"), assigned to the "graveyard shift." (Compl. ¶¶ 24–26, 30 [ECF No. 1].) In this role, Fowler was "generally responsible for supervising the operations of two to eight table games on an assigned shift." (*Id.* ¶ 27.) "During his shift, DRASMs operated in a dual role as either a Supervisor or the Assistant Shift Manager ('ASM'), depending on what was needed in the shift." (*Id.* ¶ 31.) Throughout his employment, Fowler's immediate supervisor was Antonia "Toni" Trammell, who worked as the Table games Shift Manager for the graveyard shift. (*Id.* ¶¶ 32–33.) The Table Games ASM was Matt Thyer, "a White male." (*Id.* ¶ 34 & Ex. 1.)

As Fowler explained in his Sworn Amended Charge of Discrimination to the Equal Employment Opportunity Commission (which was attached to his Complaint),

> [b]ecause Mr. Fowler and Mr. Thyer were both assistant managers, much of their work overlapped and they often worked close together. Mr. Thyer was extremely hostile to Mr. Fowler from the beginning. Although Mr. Thyer and Mr. Fowler shared the same rank and authority, Mr. Thyer treated Mr. Fowler as <u>his</u> subordinate. Mr. Thyer often addressed Mr. Fowler as if he were his subordinate and continually demeaned him. On a few occasions, Mr. Thyer often referred to Mr. Fowler as <u>"boy"</u> when he needed Mr. Fowler for some reason. More than once, Mr. Thyer told Mr. Fowler to <u>"come here boy."</u> Mr. Fowler, a Black male, knew the racially-charged [*sic*] connotation of the word "boy" when addressed to a Black male, particularly an adult.

(Compl. Ex. 1 (emphasis in original).) "After weeks of ignoring [Thyer's] comments, Mr. Fowler decided to act." (*Id.* ¶ 39.) On May 24, 2023, Fowler reported Thyer's conduct to Trammell, and Thyer was suspended for two days. (*Id.* ¶¶ 40–41.)

When Thyer returned from his suspension, however, "his behavior toward Mr. Fowler did not improve." (*Id.* ¶ 42.) In fact, despite his suspension, Thyer was given additional authority upon his return, and once he was given the additional power (which included limited

authority over Fowler), "he began to address Mr. Fowler as one of his employees and his belittling behavior intensified." (*Id.* ¶¶ 43–44.) After suffering Thyer's conduct for several more weeks, Fowler reached his limit. On June 16, he sent Trammell a text message that said, "I can't do this nomore Toni i really can't work with Matt it is so frustrated." (*Id.* Ex. 1 [*sic* throughout].) Trammell responded: "Yes you can. Just keep being good at what you do! Walk away when you have to." (*Id.*) Fowler claims that he "complained to [Trammell] multiple times of Mr. Thyer's behavior and the off-handed racist comments he would make towards Mr. Fowler. Instead of investigating the complaint and remedying the discrimination, [Trammell] told Mr. Fowler to endure the treatment in silence." (*Id.*)

On July 14, when Fowler entered the casino to clock in, he saw Thyer concluding a conversation with another employee. (*Id.* ¶ 49.) Thyer appeared upset and asked Fowler to follow him to a training room to speak. (*Id.* ¶ 51.) "Upon entering the training room, Mr. Thyer looked at Mr. Fowler and stated, '**[Y]ou nigg\*\*s are getting out of control**,'" and began "yelling at Mr. Fowler as if trying to intimidate him." (*Id.* ¶¶ 52–53 (emphasis in original).) As Trammell advised him to do, Fowler walked away, but he requested a meeting with Trammell and Kevin Schechter, the Table Games Director, to discuss Thyer's behavior. (*Id.* ¶¶ 54–55.) The meeting was scheduled for the next day but was later postponed until July 18. (*Id.* ¶¶ 56–58.)

On July 15, however, a dealer and a guest allegedly made complaints about Fowler. Apparently, a dealer claimed that Fowler "communicated negative feedback to her in front of hotel guests and players," and a guest e-mailed Trammell "complaining about" Fowler. (*Id.* ¶¶ 59–60.) So, on July 18, at the meeting that Fowler believed was about Thyer's behavior, *he*

- 3 -

"was suspended pending the investigation of these complaints." (*Id.* ¶¶ 62–63.) Fowler was directed to provide a written statement in response to the allegations, which he completed and e-mailed to Human Resources ("HR") the next day. (*Id.* ¶ 65.) In his written statement, Fowler "documented the racial slurs and 'unethical and unprofessional behavior' Mr. Thyer made towards him," and he "documented how he had previously reported Mr. Thyer's behavior to Mr. Schechter and Ms. Trammell." (*Id.* ¶¶ 66–67.) Fowler also expressed his dismay that the July 18 meeting that was supposed to be about Thyer's conduct was turned to address late-breaking allegations against him, and he expressed his belief that he was "being punished for speaking up about unethical conduct." (*Id.* ¶¶ 68–69.)

The next day—July 20—Schechter sent Fowler a text message and told him that he needed to speak with HR the following day. (*Id.* ¶ 70.) When Fowler arrived on July 21 to meet with the HR representative, "the HR representative attempted to force Mr. Fowler to admit to having bullying [*sic*] Dealers. Mr. Fowler denied the accusations and attempted to explain the racial discrimination he suffered from Mr. Thyer. Rather than allowing Mr. Fowler to discuss those allegations further," Fowler was fired. (*Id.* ¶¶ 72–74.)

Fowler filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on or about August 1, 2023, and he filed a charge with the Virginia Office of Civil Rights ("VOCR") on or about August 3, 2023. (*Id.* ¶ 10–11.) At his request, the EEOC issued a notice of right to sue on July 15, 2024, and the VOCR issued a notice of right to sue on July 25, 2024. (*Id.* ¶¶ 12–15, Exs. 3 & 4.) Fowler filed the present action in this court on August 7, 2024. He asserts six causes of action: racial discrimination under Title VII of the Civil Rights Act ("Title VII") (Count 1); race discrimination under the Virginia Human

Rights Act ("VHRA") (Count 2); hostile work environment under Title VII (Count 3); retaliation under Title VII (Count 4); retaliation under the VHRA (Count 5); and retaliation under the Virginia Whistleblower Protection Law ("VWPL") (Count 6). Caesars was served with a summons and a copy of the complaint, and on August 30, 2024, it filed the present partial motion to dismiss. (ECF No. 4.) In its motion, Caesars challenges only Counts 3 and 6. Fowler filed a response (ECF No. 8), and Caesars replied (ECF No. 9), making this matter ripe for disposition.[1]

## II.  STANDARD OF REVIEW

Motions to dismiss under Rule 12(b)(6) test the legal sufficiency of a complaint. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). To survive a Rule 12(b)(6) motion, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the plaintiff's allegations "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* While a complaint does not need "detailed factual allegations," complaints merely offering "labels and conclusions," "naked assertion[s] devoid of 'further factual enhancement,'" or "a formulaic recitation of the elements of a cause of action will not do." *Id.* (alteration in original) (internal quotation marks omitted) (quoting *Twombly*, 550 U.S. at 555, 557). When evaluating the sufficiency of a complaint, the court is obligated to consider the factual allegations asserted in the complaint as well as any exhibits attached thereto. *See*

---

[1] Neither party request oral argument and the court does not believe that oral argument would aid it in determining the legal issues presented in the motion, so the motion was submitted to the court on the pleadings only.

*Goines v. Valley Community Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016) (citing Fed. R. Civ. P. 10(c)).

### III. DISCUSSION

A. Count 3: Hostile Work Environment under Title VII

In its motion to dismiss Count 3, Caesars contends that Fowler failed to exhaust his administrative remedies with regard to his hostile work environment claim. Even if he did, it contends his allegations are insufficient to state a claim. The court is not persuaded by either argument.

Exhaustion of administrative remedies under Title VII requires the plaintiff to file a charge of discrimination with the EEOC. *See Smith v. First Union Nat'l Bank*, 202 F.3d 234, 247 (4th Cir. 2000). Filing a charge with the EEOC and receiving a right-to-sue letter from that agency are prerequisites for suing under Title VII in federal court. *Ray v. Amelia Cnty. Sheriff's Off.*, 302 F. App'x 209, 212 (4th Cir. 2008) (per curiam). The scope of a plaintiff's lawsuit is confined to "the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination." *Khoury v. Meserve*, 85 F. App'x 960, 960 (4th Cir. 2004) (per curiam). The court may not consider a claim beyond the scope of a plaintiff's EEOC charge. *Bryant v. Bell Atl. Md., Inc.*, 288 F.3d 124, 133 (4th Cir. 2002). "[S]o long as 'a plaintiff's claims in [his] judicial complaint are reasonably related to [his] EEOC charge and can be expected to follow from a reasonable administrative investigation,' [he] 'may advance such claims in [his] subsequent civil suit.'" *Sydnor v. Fairfax County*, 681 F.3d 591, 594 (4th Cir. 2012) (quoting *Smith*, 202 F.3d at 247).

Caesars argues that Fowler's EEOC charge is "silent . . . as to any generalized race-based 'harassment' allegations to which Caesars purportedly subjected him throughout his employment." (Def. Br. in Supp. Mot. Dismiss at 7 [ECF No. 5].) But a fair reading of Fowler's fulsome charge belies this claim. In that document, Fowler recounts Thyer's repeated use of the term "boy" when addressing him, which he was forced to endure for "weeks" and which resulted in Thyer's suspension. (Compl. Ex. 1.) He complained that, once Thyer returned, his behavior did not improve and he "would make off-handed remarks to Mr. Fowler, often singling out Black customers and employees unnecessarily." (*Id.*) Once Thyer was given limited authority over Fowler upon his return from his suspension, Fowler claimed that Thyer's "belittling treatment intensified." (*Id.*) Fowler even says explicitly that he was forced to "endure this hostile work environment" and eventually complained to Trammell about Thyer's continued behavior. (*Id.*) Fowler told the EEOC that he "complained to [Trammell] multiple times of Mr. Thyer's behavior and the off-handed racist comments he would make towards Mr. Fowler," but that Trammell advised him "to endure the treatment in silence." (*Id.*)

While it may be true that Fowler did not specifically list "hostile work environment" in the section of his charge labeled "Type of Employment Discrimination" (*see id.*), a plaintiff is not bound solely to the label he applies to the discrimination complained of. "[R]ather, the scope of the civil action [that follows] is confined only by the scope of the administrative investigation *that can reasonably be expected to follow* the charge of discrimination." *Chisholm v. U.S. Postal Serv.*, 665 F.2d 482, 491 (4th Cir. 1981) (emphasis added). Here, although Fowler may not have listed "hostile work environment" explicitly, he certainly alleges that he endured one. In fact, he uses that *exact* phrase in reciting the events underlying his charge of discrimination.

(*See* Compl. Ex. 1.) It follows, then, that a fair investigation of his allegations would include an investigation into the expressly alleged hostile work environment, and, thus, that this charge was raised with the EEOC.

Indeed, "[t]he touchstone for exhaustion is whether plaintiff's administrative and judicial claims are 'reasonably related,' not precisely the same, and there are sufficient similarities between the two to find this requirement satisfied . . . ." *Sydnor*, 681 F.3d at 595 (quoting *Smith*, 202 F.3d at 247). Here, Fowler claimed in his EEOC charge that he was retaliated against *for complaining about a hostile work environment*. There is no doubt in the court's mind that the alleged hostile work environment Fowler claims he was fired for complaining about is "reasonably related" to his claim of retaliatory termination. Accordingly, because the EEOC issued a notice of right to sue on a charge that was reasonably related to and whose investigation undoubtedly would have included Fowler's allegation of having to "endure" a "hostile work environment," his hostile-work-environment claim was properly exhausted and is not barred.

Caesars's argument that Fowler's allegations are insufficient to state a claim for a hostile work environment fares no better. "When racial animus in the workplace creates a hostile work environment, requiring an affected employee to work in it amounts to intentional racial discrimination by the employer and is actionable under Title VII." *McIver v. Bridgestone Am.s, Inc.*, 42 F.4th 398, 407 (4th Cir. 2022); *see Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 276–77 (4th Cir. 2015) (citing 42 U.S.C. § 2000e-2(a)(1)). To establish a prima facie case for Title VII harassment, Fowler must demonstrate "(1) unwelcome conduct; (2) that is based on [his] race; (3) which is sufficiently severe or pervasive to alter [his] conditions of employment and

- 8 -

to create an abusive work environment; and (4) which is imputable to the employer." *Boyer-Liberto*, 786 F.3d at 277 (cleaned up) (quoting *Okoli v. City of Baltimore*, 648 F.3d 216, 220 (4th Cir. 2011)). A hostile work environment claim will only succeed when "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Boyer-Liberto*, 786 F.3d at 277 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). "The severe or pervasive conduct which gives rise to an abusive work environment must be both objectively and subjectively hostile and abusive." *McIver*, 42 F.4th at 407 (cleaned up). Accordingly, "a plaintiff must demonstrate not only that he subjectively perceived his workplace environment as hostile, but also that a reasonable person would so perceive it, *i.e.*, that it was objectively hostile." *Fox v. Gen. Motors Corp.*, 247 F.3d 169, 178 (4th Cir. 2001).

Here, Caesars's argument overlooks the more expansive factual recitation in Fowler's sworn amended complaint that he attached to his complaint. When those allegations are coupled with the circumscribed allegations in his numbered complaint, a more complete picture emerges. Considering these allegations together—as the court must, *see Goines*, 822 F.3d at 166 (noting that the court's evaluation on a motion to dismiss includes "documents . . . attached to the complaint as exhibits")—the court is persuaded that Fowler's allegations are sufficient to state a claim for hostile work environment under Title VII.

First, as it relates to the unwelcome conduct that is based on race, Fowler describes being called "boy" repeatedly and notes the demeaning nature of that term when directed towards a black man. (*See* Compl. ¶¶ 37–38 and Ex. 1.) The court agrees with Fowler's characterization of the word, and his description of its usage certainly would qualify as

- 9 -

unwelcome conduct that is based on race. Moreover, he recounts an incident when Thyer allegedly yelled at him and referenced *another* racial slur, stating, "[Y]ou nigg**s are getting out of control." (*Id.* ¶ 52 & Ex. 1.) Fowler also alleges that Thyer was suspended for his conduct (specifically referring to Fowler as "boy" on multiple occasions), further bolstering his claim that the conduct was unwelcome and based on race. Fowler also recounts that he endured this behavior for "weeks" before deciding to act. (*Id.* Ex. 1.)

Second, the conduct must have been "severe or pervasive" in that it "alter[ed] [Fowler's] conditions of employment and . . . create[d] an abusive work environment . . . ." *Boyer-Liberto*, 786 F.3d at 277 (cleaned up). In this vein, the conduct "must be both objectively and subjectively hostile and abusive." *McIver*, 42 F.4th at 407 (cleaned up). Fowler describes that, after initially enduring the conduct for "weeks," he texted Trammell and said: "I can't do this nomore Toni i really can' work with Matt it so frustrated." (*Id.* Ex. 1 [*sic* throughout].) This is sufficient to allege, at this early stage, that the conduct was subjectively harassing. Based on Fowler's allegations, the court concludes that a work environment that was marred by persistent racial slurs directed at Fowler for three months is objectively hostile. While no one interaction may be been sufficient to trigger liability, repeated racial slurs directed to Fowler by a co-worker would, under the circumstances, create an objectively hostile and abusive workplace. *See, e.g.*, *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 184–85 (4th Cir. 2001) (noting the odious nature of the word "monkey" to describe an African American); *Rodgers v. Western-Southern Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993) ("Perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as '[N-word]' by a supervisor in the presence of his

- 10 -

subordinates." (cleaned up)). Like the conduct at issue in *Spriggs*, the allegedly "frequent and highly repugnant insults [Fowler alleges] were sufficiently severe or pervasive (or both) to cause a person of ordinary sensibilities to perceive that the work atmosphere . . . was racially hostile." *Spriggs*, 242 F.3d at 185.

Finally, although Caesars does not challenge that Thyer's conduct is imputable to it, the court concludes that, at this stage, it is. Here, Fowler has plainly alleged that his "employer knew or should have known of the harassment and failed 'to take prompt remedial action reasonably calculated to end the harassment.'" *Freeman v. Dal-Tile Corp.*, 750 F.3d 413, 423 (4th Cir. 2013) (quoting *Amirmokri v. Balt. Gas & Elec. Co.*, 60 F.3d 1126, 1131 (4th Cr. 1995)). Fowler alleges that, although Thyer was suspended for two days, the conduct continued—and intensified—upon his return, and that when he complained to Trammell about the conduct, he was advised to "[j]ust keep being good at what you do! Walk away when you have to." (Compl. Ex. 1.)

Caesars makes two primary arguments in support of its contention that Fowler's allegations of a months-long campaign of racial slurs and belittling and insulting behavior directed at him was not "severe or pervasive." First, it argues that Fowler's "allegations of discrete acts of discrimination . . . 'cannot be transformed, without more, into a hostile work environment claim.'" (Def.'s Br. in Supp. Mot. to Dismiss at 8 (quoting *Moss v. Pasquotank County*, No. 2:10-cv-56-BR, 2012 WL 2325846, at *10 (E.D.N.C. June 19, 2012)). But that argument misrepresents Fowler's claim and misapplies the case law. In *Moss*, an employee complained "that she was subjected to unwelcome harassment because she was deliberately assigned to the drive-thru window, was refused assignment, and was singled out by her

supervisor and assigned work beyond her job duties and responsibilities." *Moss*, 2012 WL 2325846, at *10. Those acts, the court concluded, could not establish a claim for hostile work environment because they relied "on the exact same allegations that plaintiff makes with respect to her claims of discrimination and retaliation . . . ." But here, Fowler's allegations of retaliation stem from his *termination* and allegedly trumped-up complaints of "bullying," not Thyer's conduct. Rather, it was the *complaining* about Thyer's conduct, not the conduct itself, that underlies his retaliation claims. Thyer's conduct, separate and apart from what later transpired, make out his hostile-work-environment claim. Likewise, in *Nurriddin v. Goldin*, another case on which Caesars relies, the court held that the complained-of *employment* actions—such as the destruction of travel vouchers, an ultimatum of reassignment, oral and e-mailed reprimands, etc.—cannot form the basis of a hostile work environment. 382 F. Supp. 2d 79, 106–108 (D.D.C. 2005). But that is not what Fowler alleges. It is not Caesars's employment action (his termination) that is the conduct that gives rise to his hostile-work-environment claim; rather, it's the racial slurs and threatening and belittling conduct that were "severe or pervasive" and that "alter[ed] the . . . conditions of [his] employment." *Boyer-Liberto*, 786 F.3d at 277 (cleaned up).

Second, Caesars argues that the conduct does not rise to the "high bar" necessary to state a claim. *See Brackney-Wheelock v. City of Charlottesville*, 652 F. Supp. 3d 603, 628 (W.D. Va. 2023) (quoting *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008)). While the court recognizes and agrees that a hostile work environment claim requires much more than a "mere offensive utterance," *Harris*, 510 U.S. at 17, or "simple teasing, offhand comments, and isolated incidents (unless extremely serious)," *Faragher v. City of Boca Raton*, 524 U.S. 775, 788

- 12 -

(1998) (cleaned up), what Fowler has alleged goes beyond that. As discussed in more detail above, Fowler alleges that, over the course of several months, Thyer directed racial slurs in his direction and treated him in a belittling and threatening manner. And in one incident, Thyer stated to him, "[Y]ou nigg**s are getting out of control!" (Compl. ¶ 52.) The court is sympathetic to Caesars argument that further factual allegations regarding the various "belittling" and "threatening" conduct would have been preferred, but even taking the more barebones allegations of Fowler's complaint (and sworn charge of discrimination) at face value, he has sufficiently alleged an environment that was both objectively and subjectively harassing. Accordingly, Caesars's motion to dismiss Fowler's hostile-work-environment claim will be denied.

B. Count 6: Retaliation under the VWPL

The VWPL states that "[a]n employer shall not discharge, discipline, threaten, discriminate against, or penalize an employee, or take other retaliatory action regarding an employee's compensation, terms, conditions, location, or privileges or employment, because the employee . . . in good faith reports a violation of any federal or state law or regulation to a supervisor . . . ." Va. Code Ann. § 40.1-27.3(A)(1). Importantly, any claim under this section of the VWPL must be brought "within one year of the employer's prohibited retaliatory action." *Id.* ¶ 40.1-27.3(C). Caesars contends that, because Fowler was terminated on July 21, 2023, but did not file suit in this court until August 2024, his VWPL claim is time barred.

Fowler did not address this argument in his opposition brief, apparently conceding that his WWPL claim is untimely. *See Lattimore v. Brahmbhatt*, No. 4:21-cv-00038, 2024 WL 26687, at *4 (W.D. Va. Jan. 3, 2024) (collecting cases). Moreover, on the merits, Caesars's argument

is correct; Fowler's VWPL claim was brought more than a year after his termination and is therefore barred by the applicable statute of limitations. *Accord Beckford v. Elevance Health, Inc.*, No. 3:23cv828, 2024 WL 3974241, at *5 (E.D. Va. Aug. 28, 2024); *Kulshrestha v. Shady Grove Reprod. Sci. Ctr., P.C.*, 668 F. Supp. 3d 411, 418 (E.D. Va. 2023). Accordingly, Caesars's motion to dismiss will be granted as to Count 6.

## IV. CONCLUSION

For the reasons discussed above, Caesars's motion to dismiss will be denied with respect to Count 3 and granted with respect to Count 6.

The Clerk is directed to forward a copy of this Memorandum Opinion and the accompanying Order to the parties.

**ENTERED** this 3rd day of March, 2025.

*/s/ Thomas T. Cullen*
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE